IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RAYMOND LARRY CARRASCO,

Petitioner, No. CIV S-04-2595 MCE KJM P

vs.

ROSANNE CAMPBELL, Warden,

Respondent. FINDINGS & RECOMMENDATIONS

______________________________/

Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2001 conviction on charges of making criminal threats and intimidating a witness. He seeks relief on the grounds that: (1) his right to due process was violated by the admission of evidence of prior "bad acts;" (2) his right to due process was violated by jury instruction error; (3) his conviction violates due process because he was incompetent to stand trial; and (4) his right to due process was violated by the trial court's failure to make a sua sponte determination whether he was competent to stand trial.

/////

/////

/////

I. Background

A jury convicted defendant Raymond Larry Carrasco of four counts of making criminal threats (Pen. Code, § 422 – counts one, four, five and six),[FN1] and one count of intimidating a witness (§ 136.1, subd. (c)(1) – count seven).[FN2] Defendant admitted enhancement allegations for three prior serious felony convictions (§§ 667, subds. (a) & (b) - (I), 1170.12) and service of three prior prison terms (§ 667.5, subd. (b)).

[FN1] Hereafter references to undesignated sections are to the Penal Code.

[FN2] Defendant was acquitted of counts two and three, also charging section 422 violations, and the court granted the People's motion to dismiss count eight, charging a violation of section 69.

* * *

FACTS

Counts one and five (victim Maria Carrasco): Maria Carrasco, defendant's wife, testified that in November 1999 defendant was struck by a train, suffered extensive head injuries, and was in a coma for about two weeks. At a hospital meeting, family members were advised by hospital personnel that because of the head injuries they could expect personality changes and that defendant would show increased irritability. Maria read a health advisory brochure relating to persons with head injuries; it said that threats from such persons should not be taken seriously. When defendant returned home he required 24-hour care; it took him three to four months to learn to walk. After the accident small things irritated him and he would say ugly things to her and others, but would later apologize.

Dr. Dale Watson, a neuropsychologist, determined defendant had a moderate to severe brain injury which was permanent. The injuries defendant suffered made controlling himself difficult. Dr. Watson was shown the brochure given to Maria and confirmed that a person with brain damage commonly could be expected to engage in behavioral problems and become physically abusive and short-tempered.

On August 1, 2000, Maria went to the home of her mother, Theresa Fenis, following an argument with defendant. Defendant later came to Fenis's residence and demanded Maria return home. When Maria refused, defendant became angry and threatened to blow up the house and everyone in it if she did not return with him. Maria testified that while she understood defendant was making a threat, she did not believe he would carry it out. Maria claimed she

went home with defendant because she did not want to argue with him at her parents' home.

Maria's 12-year-old niece, Tina, was present when defendant made the threat and, the following day, told her teacher, Michael Rebhan, of the incident. Rebhan called Child Protective Services and later that day Maria came to the school and met with Rebhan. According to Rebhan, during their meeting Maria seemed withdrawn and scared. She told Rebhan she was frightened of defendant and was "concerned for her [six] children." Maria said that "until [defendant] learns to control himself, we need to separate."

On August 13, 2000, Maria again went to Fenis's home due to an argument with defendant. On August 15, defendant telephoned Maria at Fenis's and told her that "he was going to make [her] suffer for leaving him and would kill all of [her] kids. The first would be George, [their] son, because [she] love[s] him the most and made [sic] sure [she] would never see any of [her] kids again." Defendant also threatened to send friends and relatives to kill Maria.

Detective Steven Bicks, assigned to investigate defendant's threats against Maria, spoke with Maria on August 16. In Bicks's view, Maria clearly was in fear of defendant. She told him of the August 15 phone call wherein defendant said he would kill her and her family; killing her last so she could see the family die. Maria confirmed defendant's threat to blow up Fenis's home, which also caused Maria to fear him. Maria said that even if defendant was in jail, she feared him because of his prison gang connections through which he could harm her and the children.

At trial, Maria repeatedly denied being afraid of defendant, claiming his threats were caused by his head injury and therefore she did not take them seriously. Maria said her prior statements to the contrary were not true, but were spoken out of anger and were exaggerated.

Counts six and seven (victim Theresa Fenis): Fenis testified that in early August 2000, Maria came to Fenis's home because she and defendant had argued. Maria was frightened, but would not tell her why. Defendant telephoned Fenis and told her not to call the police, to stay out of his business, he threatened to burn her house down with her in it, and told her to tell her brothers that he would "take care of them, too."

Count four (victim Julie DeVere): DeVere testified that following defendant's and Maria's argument on August 13, 2000, she drove Maria and three of Maria's children to Fenis's home. The next day defendant saw DeVere, called her a "fucking bitch," and said he was going to "get" or "kill" her. DeVere was very frightened

because she was aware of defendant's criminal background and defendant's 16-year-old son, George, had told DeVere that defendant was capable of committing such an act.

Uncharged incidents:  In July 1987, Denise Cortez, who had been dating defendant and had three children by him, testified she was home with her two-year-old daughter, her one-year-old son, and a friend's six-year-old boy, Stevie.  Defendant kicked the door down, entered, grabbed Cortez by the hair and knocked her unconscious by striking her on the head with a gun.  When Cortez regained consciousness she went outside, but defendant followed her and, at gunpoint, forced her to return to the house.  While still holding the gun, defendant grabbed Stevie and "[a]sked who he was."  Defendant eventually released the scared and crying child.  Defendant told Cortez that "if [she] said his name," meaning reported him to the police, "he would shoot [her]."

Maria was aware of the assault on Cortez and that defendant had been convicted of the assault and sent to state prison.  Maria was also aware of an incident in 1991, following defendant's release from prison, where defendant stabbed Maria's uncle, Peter Rivera, during an argument.  Maria knew that defendant had pled guilty to battery with serious bodily injury and was sent to prison.

In May 1993, Officer Christopher Taylor observed a van being driven by defendant run a red light.  Taylor activated his red lights and attempted to stop defendant; however, defendant accelerated and Taylor gave chase.  During the chase, defendant reached speeds of 60 to 70 miles per hour and, on three occasions, slammed on the van's brakes, almost stopping, and then accelerating again.  The chase ended when the van's engine blew up.

Defendant, who is five feet seven inches tall, weighed 150 pounds and was "very muscular," got out of the van with "fists up" and taunted Taylor as well as Officer Daniel Schiele, who had joined the chase.  After scuffling with and punching Schiele's police dog, defendant was taken into custody.  Defendant told Taylor, "I'll be out in less than a year because the system is broke and that's when I am going to find out where you live and kill you."  Defendant also said that before killing Taylor he "would fuck [him] in the ass," "he would make [him] suck his dick like a punk in the joint," and he "would wait for [him] to patrol his neighborhood in order for [defendant] to find [him]."

Maria was aware of the "dog punching" incident.

In November 1994, Deputy George Marquardt attempted to pull over an Oldsmobile being driven by defendant with Max Lopez, Maria's step-cousin, as the passenger.  Instead of pulling over, defendant accelerated, leading to a chase during which defendant reached speeds of 100 miles per hour.  The chase ended when

> another officer was able to push the Oldsmobile off the road. Defendant was placed in the back of Marquardt's patrol car where he told Marquardt that he "was going to fuck [him] up and fuck up [his] family," and that "if [Marquardt] took the cuffs off of him, [defendant] would kick [his] ass."
>
> Lopez testified that prior to the stop by Marquardt, defendant, who had been sniffing paint and drinking, had gotten into an argument with Maria and pointed a gun at her. Defendant then asked Lopez, "Hey Max, do you think I should kill her." Cindy Estrada, defendant's younger sister, testified defendant had not pointed a gun at Maria as Lopez had testified. Maria testified that Lopez called her after the stop on November 22 and told her that he had given false statements. However, Officer Scott Eckert testified that following the stop of the Oldsmobile, Lopez said defendant had pointed a gun at Maria and asked Lopez if he should kill her.

August 14, 2003 Opinion of California Court of Appeal for the Third Appellate District (filed by Respondent on July 25, 2005 as Lodged Document 3; hereinafter Opinion) at 1-7.

II. Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a).

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Although "AEDPA does not require a federal habeas court to adopt any one methodology," Lockyer v. Andrade, 538 U.S 63, 71 (2003), there are certain principles which guide its application.

/////

First, the "contrary to" and "unreasonable application" clauses are different. As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002). It is the habeas petitioner's burden to show the state court's decision was either contrary to or an unreasonable application of federal law. Woodford v. Visciotti, 537 U.S. 19, 123 S. Ct. 357, 360 (2002). It is appropriate to look to lower court decisions to determine what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law. See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 2000).

Second, the court looks to the last reasoned state court decision as the basis for the state court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). So long as the state court adjudicated petitioner's claims on the merits, its decision is entitled to deference, no matter how brief. Lockyer, 538 U.S. at 76; Downs v. Hoyt, 232 F.3d 1031, 1035 (9th Cir. 2000). However, when the state court does not issue a "reasoned opinion," this court must undertaken an independent review of the claims. Delgado v. Lewis, 223 F.3d 976, 982. (9th Cir. 2002).

Third, in determining whether a state court decision is entitled to deference, it is not necessary for the state court to cite or even be aware of the controlling federal authorities "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2003). Moreover, a state court opinion need not contain "a formulary

/////

statement" of federal law, so long as the fair import of its conclusion is consonant with federal law. Id.

III. Petitioner's Claims

A. Evidence of Prior "Bad Acts"

Petitioner's first claim is that the trial court violated his right to due process when it admitted evidence of prior "bad acts" under California Evidence Code § 1101 to show petitioner's intent and under § 1109 to show that petitioner had a propensity for domestic violence. (Points and Authorities attached to Petition (hereinafter P&A) at 11-23.)[1] Petitioner

---

[1] Cal. Evidence Code § 1101 provides as follows:

> (a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.
>
> (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act.
>
> (c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness.

Cal. Evidence Code § 1109 provides, in pertinent part:

> (a)(1) . . . in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352.
>
> * * *
>
> (e) Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court

argues that the evidence offered to show his intent was not relevant for that purpose and was introduced for the sole purpose of showing that he had "a violent disposition."  (Id. at 17:3-6.) He also argues that evidence offered to show propensity was too remote in time to be relevant and was unduly prejudicial.  (Id. at 19-21.)

The trial court admitted evidence of prior domestic violence pursuant to California Evidence Code § 1109, consisting of "Denise Cortez's testimony relating [petitioner's] assault on her in July 1987 and Max Lopez's testimony relating defendant's pointing a gun at Maria in November 1994." (Opinion at 7.)  The trial court also admitted evidence pursuant to California Evidence Code § 1101 of "the officers' testimony relating the high speed chases and [petitioner's] threats to them for the purpose of proving that [petitioner] intended that his threats to Maria be taken seriously." (Id.)  Petitioner contends that the admission of this evidence was prejudicial and "created a substantial risk that [petitioner] was convicted on the basis of his prior misconduct, in violation of federal due process and equal protection." (P&A at 21, 23.)

The California Court of Appeal denied petitioner's claims concerning the evidence admitted under Evidence Code § 1101.  The state court noted that petitioner was charged with a violation of Penal Code § 422, which requires, among other things, "that the defendant had the specific intent that his statement would be taken as a threat (whether or not he actually intended to carry the threat out)." (Opinion at 8.)  For the following reasons, the court found that evidence regarding the high speed chases and petitioner's threats to the police were admissible under California law to show petitioner's intent:

> When defendant was arrested by Officer Taylor, he threatened to find out where Taylor lived, wait for him and kill him.  When defendant was arrested by Officer Marquardt, he threatened to kill

---

> determines that the admission of this evidence is in the interest of justice.

    > Marquardt and Marquardt's family. On two occasions when Maria was at Fenis's residence and refused defendant's demands that she return home, he threatened to kill her and the children. When defendant believed Fenis was interfering in his business, he threatened to burn her house down and to "take care of" her and her brothers. The day after DeVere had driven Maria to Fenis's home, defendant told her he was going to "get" or "kill" her.
>
> The threats were similar in that they either expressly or impliedly involved killing the person to whom they were directed and sometimes their families. The threats were also made in similar circumstances, namely, to people with whom defendant had become angered because they were not doing as he wished. Thus, the similarity of the threats and the circumstances under which they were made was probative of whether defendant intended the threats be taken seriously.
>
> In sum, the evidence of the defendant's uncharged threats to the police officers and the circumstances in which they occurred was highly probative on the issue of whether defendant intended his charged threats be taken as such.

(Id. at 10.)

The California Court of Appeal also denied petitioner's claims concerning the evidence admitted pursuant to Evidence Code § 1109. The court concluded that testimony regarding petitioner's acts of domestic violence in 1987 and 1994 was admissible even though those incidents occurred more than ten years prior to the charged offenses. The court reasoned as follows:

> In admitting Cortez's testimony, the trial court stated: "I think it's a close question. I think [the] legislature had something in mind when they talked about 10 years. But I'm going to admit it under 1109. They did not bar it. I think the intimation by the 10-year limitation, if you will, is that if we had another wise [sic] blameless defendant, let's say 11, 12, 14 years ago something happened and in the interim found a higher, better life-calling and led a blameless life, then I think it would be inappropriate and frankly that may be the case if that turn around came six or eight years. You may have equal justification for excluding that to say that was then and this is now. Let's not get the past confused with the present. [¶] This defendant on the other hand has not, I think, exhibited that pattern. Only until very recently has he found a higher lifestyle or manner of living. The assaults on women, Ms. Carrasco happened in 1993 or 1994 and again allegedly in the year 2000 he was violent. He has been violent. He has a history of violence throughout the '90s for which he pled guilty in most cases or was otherwise convicted

> and so I think – I think it's appropriate to go back some 13 or 14 years."
>
> We believe the trial court accurately described at least one circumstance which the Legislature had in mind when it enacted subdivision (e), namely, where a defendant has failed to lead a blameless life in the interim between the uncharged and the charged offense. This is not a new concept. For example, generally, the more remote a prior conviction the less probative it is of a witness's credibility, but this is not the case where the prior conviction is not followed by a blameless life. [Citations omitted.]
>
> Here, as the trial court observed, in the interim between defendant's assault on Cortez and the charged offenses, rather than leading a blameless life, defendant had continued his violent ways. Additionally, given Maria's express denial of defendant's having pointed a gun at her as claimed by Max Lopez, coupled with her repeated claims that she did not fear defendant because he was not a violent person, the Cortez incident tended to impeach that testimony. Likewise, the testimony of Cortez and Lopez was admissible to impeach Maria's testimony that prior to defendant's brain injury in November 1999, he had never been violent with her. Consequently, the trial court properly admitted evidence of the Cortez incident.

(Id. at 12-13.)

The question whether evidence of prior uncharged acts was properly admitted under California law is not cognizable in this federal habeas corpus proceeding. Estelle v. McGuire, 502 U.S. 62, 67 (1991). The only question before this court is whether the trial court committed an error that rendered the trial so arbitrary and fundamentally unfair that it violated federal due process. Id.; see also Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991) ("the issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point"). A writ of habeas corpus will be granted for an erroneous admission of evidence "only where the 'testimony is almost entirely unreliable and ... the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings.'" Mancuso v. Olivarez, 292 F. 3d 939, 956 (9th Cir. 2002) (quoting Barefoot v. Estelle, 463 U.S. 880, 899 (1983)). Evidence violates due process only if "there are no permissible inferences the jury may draw from the evidence."

Jammal, 926 F. 2d at 920. Even then, evidence must "be of such quality as necessarily prevents a fair trial." Id. (quoting Kealohapauole v. Shimoda, 800 F.2d 1463 (9th Cir. 1986)).

Under Ninth Circuit law, the admission of “other acts” evidence violates due process only if there were no permissible inferences the factfinder could have drawn from the evidence. See McKinney v. Rees, 993 F.2d 1378, 1381 (9th Cir. 1993) (question is “whether any inferences relevant to a fact of consequence may be drawn from each piece of the evidence, or whether they lead only to impermissible inferences about the defendant's character”); Jammal, 926 F.2d at 920 ("[e]vidence introduced by the prosecution will often raise more than one inference, some permissible, some not; we must rely on the jury to sort them out in light of the court's instructions"). See also United States v. LeMay, 260 F.3d 1018, 1027 (9th Cir. 2001) (evidence of prior similar crimes “will only sometimes violate the constitutional right to a fair trial, if it is of no relevance, or if its potential for prejudice far outweighs what little relevance it might have”). However, for purposes of AEDPA, petitioner must demonstrate that the California courts’ rejection of his federal due process claim was contrary to or an unreasonable application of “clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003).

Petitioner’s trial was not rendered fundamentally unfair because of the admission of evidence of his prior bad acts. The prior acts evidence against petitioner was reliable and relevant to the charged crimes. Further, the evidence had a tendency to show petitioner’s intent and was admissible to impeach Maria’s testimony. Although the prior crimes evidence was graphic and potentially powerful, “[the fact] that prior acts evidence is inflammatory is not dispositive in and of itself.” LeMay 260 F.3d at 1030. The People’s case against petitioner was substantial. Finally, the other incidents were no more inflammatory than the circumstances of the charged crimes. Under these circumstances, admission of the “other crimes” evidence did not result in a due process violation.

/////

In any event, the United States Supreme Court "has never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith, or that it violates due process to admit other crimes evidence for other purposes without an instruction limiting the jury's consideration of the evidence to such purposes." Garceau v. Woodford, 275 F. 3d 769, 774 (9th Cir. 2001), overruled on other grounds by Woodford v. Garceau, 538 U.S. 202 (2003). In fact, the Supreme Court has expressly left open this question. See Estelle, 502 U.S. at 75 n.5 ("Because we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime"). Petitioner therefore has failed to demonstrate that the California courts' rejection of his federal due process claim was contrary to or an unreasonable application of "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). See Larson v. Palmateer, 515 F.3d 1057, 2008 WL 375203 at *6 (9th Cir. 2008) (claim that trial court's use of "other crimes" evidence to show a propensity for criminal activity violated due process properly denied under AEDPA because the Supreme Court has "expressly left this issue an 'open question'"); Alberni v. McDaniel, 458 F.3d 860, 863-67 (9th Cir. 2006), cert. denied. ___ U.S. ___, 127 S. Ct. 1834 (2007) (denying the petitioner's claim that the introduction of propensity evidence violated his due process rights under the Fourteenth Amendment because "the right [petitioner] asserts has not been clearly established by the Supreme Court, as required by AEDPA"); Holgerson v. Knowles, 309 F.3d 1200, 1202 (9th Cir. 2002) (habeas relief not warranted unless due process violation was "clearly established" under federal law as determined by the Supreme Court); Alvarado v. Hill, 252 F.3d 1066, 1068-69 (9th Cir. 2001) (same).

Further, any error in admitting this testimony did not have "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). See also Penry v. Johnson, 532 U.S. 782, 793-96 (2001). Any threat of improper prejudice flowing from the testimony concerning petitioner's prior behavior was

mitigated by the trial court's instruction directing the jury to consider the uncharged acts testimony only as relevant to show the existence of intent and/or motive and not to show that petitioner was a person of bad character or that he had a disposition to commit crimes. (Respondent's Lodged Document 16, Clerk's Transcript on Appeal (hereinafter CT) at 211.) The jury is presumed to have followed this instruction. Old Chief v. United States, 519 U.S. 172, 196-97 (1997); United States v. Reed, 147 F.3d 1178, 1180 (9th Cir. 1998).

Accordingly, for all of these reasons, petitioner is not entitled to relief on this claim.

B. Jury Instruction Error

Petitioner's jury was instructed with CALJIC No. 17.41.1, which provides as follows:

> The integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves as required by these instructions. Accordingly, if any juror refuses to deliberate, or expresses an intention to disregard the law, or to decide the case based on penalty or punishment, or any other improper basis, it is the obligation of the other jurors to immediately advise the Court of that situation.

(CT at 219). Petitioner claims that this jury instruction "urged the jurors to inform on one another, and thereby impinged upon [petitioner's] Sixth and Fourteenth Amendment rights to a unanimous jury." (P&A at 24-27.)

Petitioner's claim for relief is foreclosed by the decision in Brewer v. Hall, 378 F.3d 952, 955-57 (9th Cir. 2004). In Brewer, the Ninth Circuit held that, regardless of the "constitutional merits" of CALJIC No. 17.41.1, habeas corpus relief was unavailable on the identical claim presented by petitioner here because there is "no Supreme Court precedent clearly establishing" that use of this jury instruction violates a defendant's constitutional rights. Id. at 955-56. Here, as in Brewer, petitioner "has pointed to no Supreme Court precedent clearly establishing that CALJIC 17.41.1--either on its face or as applied to the facts of his case--violated his constitutional rights." Id. at 957. See also Osumi v. Giurbino, 445 F.Supp.2d 1152, 1165

(C.D. Cal. 2006) (concluding that the holding in Brewer controls and forecloses a federal habeas claim challenging CALJIC 17.41.1). Thus, the state court's rejection of petitioner's jury instruction claim was not contrary to or an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d).[2]

Even if the state trial court erred in instructing the jury with CALJIC No. 17.41.1, any such error was harmless under the circumstances of this case. See Brecht, 507 U.S. at 623 (a federal court may not grant habeas relief for trial errors without a showing of actual prejudice, defined as a "substantial and injurious effect or influence in determining the jury's verdict"). There is no evidence that any of the jurors at petitioner's trial refused to deliberate or that any juror was a holdout for acquittal. There is simply no indication that the giving of CALJIC No. 17.41.1 in this case chilled the jurors' exercise of free speech or prevented free and full deliberations on the part of the jury. Accordingly, petitioner is not entitled to relief on this claim.

C. Petitioner's Competence to Stand Trial

Petitioner's next claim is that his conviction violates due process because he was incompetent to stand trial. (P&A at 29.) Petitioner states that he "was deemed incompetent and borderline retarded and the facts were not disputed." (Id.) In support of this claim, petitioner has provided the medical records concerning his train accident. (See medical records attached to Petition.)

The conviction of a legally incompetent defendant violates the Due Process Clause of the Fourteenth Amendment. Cooper v. Oklahoma, 517 U.S. 348, 354 (1996); Cacoperdo v. Demosthenes, 37 F.3d 504, 510 (9th Cir. 1994). The test for competency is "whether the defendant has sufficient present ability to consult with his lawyer with a reasonable

---

[2] In People v. Engelman, 28 Cal. 4th 436, 439-40 (2002), the California Supreme Court held that CALJIC No. 17.41.1 "does not infringe upon defendant's federal or state constitutional right to trial by jury or his state constitutional right to a unanimous verdict." However, using its supervisory authority over the lower state courts, the California Supreme Court discontinued the use of CALJIC No. 17.41.1 because of its "potential" to intrude on jury deliberations. Id. at 440.

degree of rational understanding and has a rational as well as factual understanding of the proceedings against him." Godinez v. Moran, 509 U.S. 389, 396 (1993) (quoting Dusky v. United States, 362 U.S. 402, 402 (1960)). See also Miles v. Stainer, 108 F.3d 1109, 1112 (9th 1997) ("When analyzing competence to plead guilty, we look to whether a defendant has the ability to make a reasoned choice among the alternatives presented to him." (internal quotes omitted)). Whether a defendant is capable of understanding the proceedings and assisting counsel depends on "evidence of the defendant's irrational behavior, his demeanor in court, and any prior medical opinions on competence to stand trial." Drope v. Missouri, 420 U.S. 162, 180 (1975). None of these factors is determinative, but any one of them may be sufficient to raise a reasonable doubt regarding competence. Id. The burden of establishing mental incompetence rests with the petitioner. Boag v. Raines, 769 F.2d 1341, 1343 (9th Cir. 1985); McKinney v. United States, 487 F.2d 948, 949 (9th Cir. 1973).

Petitioner has failed to meet his burden of demonstrating that he was incompetent to stand trial. It is undisputed that petitioner suffered a serious head injury, which caused some personality changes and increased irritability. However, there is no evidence from the state court record or from the medical records attached to the petition that petitioner's injuries rendered him unable to understand the proceedings against him or to competently consult with his lawyer. On the contrary, the medical records attached to the petition reflect that petitioner's mood swings resulting from the accident were well controlled by medication. (See, e.g., medical records attached to Petition, at pgs. marked 138, 139, 141; Traverse, Ex. C.) There also is no evidence that any person present perceived that petitioner was unable to comprehend the proceedings. No party raised a question as to petitioner's competency during the trial. See Medina v. California, 505 U.S. 437, 450 (1992) ("defense counsel will often have the best-informed view of the defendant's ability to participate in his defense"); United States v. Lewis, 991 F.2d 524, 528 (9th Cir. 1993) (a defense counsel's silence on the petitioner's competency is some evidence that the petitioner showed no signs of incompetence at that time); Hernandez v. Ylst, 930 F.2d 714, 718

(9th Cir. 1991) ("[w]e deem significant the fact that the trial judge, government counsel, and Hernandez's own attorney did not perceive a reasonable cause to believe Hernandez was incompetent").

Under the circumstances presented here, petitioner has failed to demonstrate that he was incompetent to stand trial. Accordingly, he is not entitled to relief on this claim.

D. Sua Sponte Competency Determination

Petitioner's final claim is that his right to due process was violated by the trial court's failure "on its own motion to impanel a jury to determine if [petitioner] was competent to stand trial and whether he was competent at the time of the offense, trial and sentencing." (P&A at 30.)

The Due Process Clause requires a state trial court to inquire into a defendant's competency sua sponte if a reasonable judge would be expected to have a bona fide doubt as to the defendant's competence. Pate v. Robinson, 383 U.S. 375, 385 (1966); Blazak v. Ricketts, 1 F.3d 891, 893 & n.1 (9th Cir. 1993); Chavez v. United States, 656 F.2d 512, 515-17 (9th Cir. 1981). Pursuant to California Penal Code § 1368, a competency hearing is required when the trial judge entertains and declares a doubt as to a defendant's competence to stand trial.[3] Here,

---

[3] Section 1368 provides, in relevant part, that:

> (a) If, during the pendency of an action and prior to judgment, a doubt arises in the mind of the judge as to the mental competence of the defendant, he or she shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent. If the defendant is not represented by counsel, the court shall appoint counsel. At the request of the defendant or his or her counsel or upon its own motion, the court shall recess the proceedings for as long as may be reasonably necessary to permit counsel to confer with the defendant and to form an opinion as to the mental competence of the defendant at that point in time.
>
> (b) If counsel informs the court that he or she believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be

petitioner has failed to demonstrate that the trial judge should have harbored a bona fide doubt as to petitioner's competence to stand trial or to be sentenced. As explained above, the record before this court does not reflect any inability on petitioner's part to competently consult with his trial attorney or to understand the proceedings. There is no record of any irrational behavior by petitioner and there is no evidence that petitioner had previously been adjudged incompetent to stand trial or to enter a plea. Cf. Blazak, 1 F.3d at 897 (competency hearing should have been conducted where state trial court had records explaining defendant's extensive history of mental illness and previous adjudications of incompetency, and there was no finding of competency at the time of defendant's trial); Chavez, 656 F.2d at 519 (evidentiary hearing required where petitioner had a history of antisocial behavior and treatment for mental illness, demonstrated emotional outbursts in court, had a previous psychiatric finding of insanity and there was an inference that petitioner had not even attempted to plea bargain for a lesser sentence); Cacoperdo, 37 F.3d at 510 (conclusory allegation that defendant was "suffering mental illness at the time the alleged incidents took place and may still be suffering from mental illness" not sufficient to "raise a reasonable doubt concerning [defendant's] competency to stand trial"). The record in this case simply does not support petitioner's allegation that his constitutional rights were violated by the failure of the trial court to order a competency hearing.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written

---

determined in a hearing which is held pursuant to Sections 1368.1 and 1369. If counsel informs the court that he or she believes the defendant is mentally competent, the court may nevertheless order a hearing. Any hearing shall be held in the superior court.

objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: March 14, 2008.

U.S. MAGISTRATE JUDGE

8:carrasco2595.hc